**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

UNITED STATES OF AMERICA,

      Plaintiff,

v.                              Case No. 17-40105-01-DDC

JUAN BELTRAN (01),

      Defendant.

## MEMORANDUM AND ORDER

On September 15, 2017, Trooper Jarrad Goheen of the Kansas Highway Patrol ("KHP") stopped defendant Juan Beltran for speeding. Mr. Beltran says Trooper Goheen violated his Fourth and Fifth Amendment rights during their interactions. Specifically, Mr. Beltran first argues that Trooper Goheen unlawfully extended the traffic stop after he gave Mr. Beltran a warning. Then, Mr. Beltran contends, Trooper Goheen unlawfully searched his vehicle. Finally, Mr. Beltran argues that Trooper Goheen violated his Fifth Amendment rights when Trooper Goheen failed to recite Mr. Beltran's *Miranda*[1] rights before questioning him. So, Mr. Beltran's Motion to Suppress asks the court to suppress: (1) the evidence seized from the vehicle's search; and (2) his statements to Trooper Goheen. For reasons explained in this Order, the court grants Mr. Beltran's Motion to Suppress (Doc. 18) in part and denies it in part.

## I.    Background

The following facts are taken from the evidence presented at the July 17, July 27, and August 2, 2018, motion hearings.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

Around 8:20 a.m. on September 15, 2017, Trooper Goheen stopped Mr. Beltran for traveling at 68 miles per hour in a 60-mile-per-hour construction zone established on Interstate 70. When Trooper Goheen initiated the traffic stop, Mr. Beltran pulled over on the right shoulder adjacent to the eastbound lanes of Interstate 70. The stop occurred just east of Exit 199. For simplicity, the court divides Trooper Goheen's interactions with Mr. Beltran into the following five encounters.

The first encounter begins with Trooper Goheen initially approaching the driver's window of Mr. Beltran's car after Trooper Goheen pulled him over. That encounter lasts until the end of Trooper Goheen's conversation with Lieutenant Scott Walker, another member of the KHP, in Trooper Goheen's patrol car while he ran some traffic checks. The second encounter covers the rest of the traffic stop. It begins when Trooper Goheen again approached the driver's window of Mr. Beltran's car after Trooper Goheen ran traffic checks. And it ends when Trooper Goheen began to walk back to his patrol vehicle but pivoted at the rear edge of Mr. Beltran's car and started back toward the driver's window. The third encounter starts when Trooper Goheen returned to Mr. Beltran's car and asked him some additional questions; it ends when Trooper Goheen searched the trunk of Mr. Beltran's car while Lt. Walker secured Mr. Beltran in the passenger seat of Trooper Goheen's patrol car. The fourth encounter covers Trooper Goheen's conversation with Mr. Beltran while he was seated in the front seat of Trooper Goheen's patrol vehicle. That fourth encounter ends when Trooper Goheen decided to drive Mr. Beltran to the KHP's office in Russell, Kansas. And the last encounter encompasses the car ride from the scene of the traffic stop back to the KHP's Russell, Kansas, office. During this fifth encounter, Trooper Goheen was driving his patrol car, and Mr. Beltran was a passenger in it. A video from Trooper Goheen's dash-mounted camera captures the first four encounters. *See* Gov. Ex. 1.

Parts A through E, following, describe the court's findings of fact about these five encounters.

## A.     First Encounter

The first encounter began when Trooper Goheen approached the driver's side window of a car he had stopped. He explained to its driver that he was speeding in a construction zone. Then, Trooper Goheen requested the driver to provide his driver's license. It identified the driver as Juan Beltran, the defendant charged in this action. Trooper Goheen asked Mr. Beltran if he was on vacation. Mr. Beltran said that he was, so Trooper Goheen asked where he was headed. Mr. Beltran explained that he was going to Kansas City. Trooper Goheen then asked if Mr. Beltran had family in Kansas City. Mr. Beltran said he did. Trooper Goheen also learned that Mr. Beltran was from California, and that this was his first time visiting Kansas. Trooper Goheen then asked Mr. Beltran whether the car he was driving belonged to him and whether he had his insurance and registration. While Mr. Beltran retrieved these documents from their location inside the car, Trooper Goheen again asked if Mr. Beltran had family in Kansas City. Trooper Goheen specifically asked, "What part of Kansas City?" Gov. Ex. 1 at 3:15–22. Mr. Beltran responded, "the northern part." Trooper Goheen then learned that Mr. Beltran was traveling from Bell Gardens, California. Trooper Goheen asked how long Mr. Beltran was going to stay in Kansas City. Mr. Beltran responded, "a couple of days." Trooper Goheen commented that this was a "pretty quick trip." *Id.* at 3:30–42. After asking more questions about Mr. Beltran's occupation and "what happened" to Mr. Beltran's windshield, Trooper Goheen informed Mr. Beltran that he was going to issue him a warning.

Trooper Goheen testified about Mr. Beltran's demeanor during this encounter. He opined that Mr. Beltran appeared "very nervous." Trooper Goheen based this assessment on his

observations that Mr. Beltran's hands were shaking, beads of sweat had formed on his forehead, and he was avoiding eye contact with Trooper Goheen. He also noticed that Mr. Beltran's eyes were watery, and they had bags under them—indicating to the trooper that Mr. Beltran was tired. Trooper Goheen then reviewed the registration and insurance documents. He testified that initially he was suspicious because the car was registered to "Alejandro Beltran"—and not Juan Beltran. But this suspicion was dispelled when he saw that Juan Beltran was the name listed on the insurance documentation. Finally, Trooper Goheen noted that Mr. Beltran didn't react to the news that the Trooper only was issuing a warning instead of a citation. Trooper Goheen testified that he tells people they are receiving a warning and then evaluates whether it reduces their level of nervousness. He said Mr. Beltran's nervousness did not subside. This encounter ended with Trooper Goheen returning to his patrol car.

Once he returned to his patrol vehicle, he ran some traffic checks. Specifically, he checked with his dispatcher about Mr. Beltran's driver's license, registration, and criminal history. While Trooper Goheen waited for the dispatcher to respond, he also checked the License Plate Reader ("LPR") for Mr. Beltran's license plate. According to Trooper Goheen, the LPR takes pictures of license plates as cars pass through toll booths along the Kansas Turnpike. The LPR showed that Mr. Beltran's vehicle had been in Kansas on June 28, 2017—about three months earlier.

While Trooper Goheen conducted these checks, Lieutenant Scott Walker, also a member of the KHP, arrived on the scene. He joined Trooper Goheen in the passenger seat of his patrol car. Trooper Goheen and Lt. Walker discussed Mr. Beltran having said he had not been to Kansas before, but the LPR showed that his car had been in Kansas in June 2017. Trooper Goheen commented that "it" was "kinda weird," and said Mr. Beltran was "nervous." *Id.* at

10:07–10.  They then discussed the date of Mr. Beltran's registration—it was issued on June 23,

2017.  This was just five days before the LPR showed the car in Kansas.  Lt. Walker asked

Trooper Goheen about Mr. Beltran's travel plans, and Trooper Goheen explained that Mr.

Beltran had told him he was going to Kansas City to visit family, but Mr. Beltran "doesn't know

where" in Kansas City.  *Id.* at 10:30–38.  Trooper Goheen further explained the extent of Mr.

Beltran's knowledge about his destination—"Just Kansas City—[he] doesn't know the address

or anything."  *Id.* at 10:36–40.

### B.    Second Encounter

Trooper Goheen's second encounter with Mr. Beltran lasted just 24 seconds.  *See id.* at

11:40–12:04.  Trooper Goheen again approached the driver's side window of Mr. Beltran's car.

He told Mr. Beltran that he was going to give him a warning and instructed him to watch his

speed in construction zones.  He asked Mr. Beltran if he had any questions—Mr. Beltran said he

didn't—and then Trooper Goheen told Mr. Beltran to "have a safe trip."  *Id.* at 12:00–04.  Then,

Trooper Goheen began to walk back to his patrol vehicle.  But when Trooper Goheen reached

the rear edge of Mr. Beltran's vehicle, he pivoted and started back in the direction of the driver's

side window of Mr. Beltran's car.

### C.    Third Encounter

As Trooper Goheen turned back toward Mr. Beltran's car, he asked him, "Hey, can I ask

you a question, Juan?"  *Id.* at 12:05–07.  Although the dash camera video does not capture Mr.

Beltran's response, Trooper Goheen testified that Mr. Beltran responded verbally with "yeah" or

"yes."  Trooper Goheen then confirmed that Mr. Beltran was going to stay in Kansas City merely

for the weekend and again inquired about his occupation.  Next, Trooper Goheen asked about

when Mr. Beltran planned to return to California.  While the wind's interference on Trooper

Goheen's microphone makes it difficult to hear the entirety of Mr. Beltran's response, Mr.

Beltran said, in part, "maybe Sunday," and then he said something about "Saturday night." *Id.* at

12:26–34. Trooper Goheen testified at the July 17, 2018, hearing that Mr. Beltran told him he

planned to leave Kansas City on Saturday. Trooper Goheen also asked Mr. Beltran about his

family. Then, Trooper Goheen again asked if this trip was Mr. Beltran's first trip to Kansas. Mr.

Beltran said it was, so Trooper Goheen asked if anyone else ever had driven his car to Kansas.

Mr. Beltran responded, "No." *Id.* at 12:48–13:06.

Trooper Goheen then asked why Mr. Beltran was staying in Kansas City for such a short

amount of time. Trooper Goheen confirmed, again, that Mr. Beltran was leaving on Saturday

night. Next, Trooper Goheen asked Mr. Beltran if he had any guns, drugs, or large amounts of

currency in the car. Mr. Beltran said no. Trooper Goheen then asked Mr. Beltran if he could

search the car. Mr. Beltran said no. Finally, Trooper Goheen inquired why Mr. Beltran was so

nervous, and then asked him if everything was okay.

Trooper Goheen then directed Mr. Beltran to get out of his car, and Trooper Goheen

walked Mr. Beltran to the rear of the car. Trooper Goheen patted him down and informed him

that Lt. Walker was going to employ a police K-9. This news upset Mr. Beltran, who explained

that he had had bad experiences with cops.

### 1. Dog Sniff

Lt. Walker then deployed his police canine, Zeke. Lt. Walker is assigned to the KHP's

Police Service Dog Unit, and he has served as a KHP canine handler since 2009. Zeke is a KHP

patrol canine whom Lt. Walker trained and handled. Lt. Walker, in addition to his patrol duties,

trains canines to detect controlled substances (and to perform other law enforcement functions)

for the KHP. Before Zeke's initial deployment as a patrol canine, Lt. Walker and Zeke

participated together in a ten-week training regimen. The program was designed to train Zeke to function as a narcotics detection and patrol-certified dog. Zeke graduated from this training program in May 2015, and, after graduation, Zeke was certified in narcotics detection and patrol duties.

In addition to Zeke's initial training, Lt. Walker conducts weekly "maintenance" trainings designed to keep Zeke's detection and patrol abilities honed. Also, as part of Zeke's training and maintenance, Zeke is certified annually. Annual certification involves Zeke participating in scenarios designed to test his ability to detect the presence of controlled substances reliably. The KHP trains and maintains all their police canines "in-house," and it relies on non-KHP personnel to test and certify their canines. As relevant here, Overland Park Police Department Officer Cory Flaming certified Zeke on October 3, 2016. Zeke was due for recertification on October 3, 2017.

During their October 3, 2016, certification test, Lt. Walker and Zeke received an overall team score of 2.18. Gov. Ex. 3. This was a passing score and fell in the "commendable" score range.[2] Lt. Walker testified that Zeke never has received a score lower than a four. And, during the October 3, 2016, certification, Zeke did not identify and locate the source of any substance other than contraband, *i.e.*, he had no false positives.

During Mr. Beltran's stop, Lt. Walker directed Zeke to begin sniffing counterclockwise along the passenger side of the car. Zeke deviated from his normal sniffing pattern and began intensely sniffing along the seam on the driver's side of the trunk and moving toward the passenger side of the trunk seam. Lt. Walker reported that Zeke's sniffing was intense and

---

[2]    The certifying official can give a score between 1 and 6. One is the best score, and 6 is the worst. The following descriptions are assigned to each number: 1-superior; 2-commendable; 3-typical; 4-acceptable; 5-remediation needed; and 6-not exhibiting training. Gov. Ex. 3.

focused on the car's trunk seam.  Lt. Walker testified that this behavior constituted an "alert."

To Lt. Walker, Zeke's behavior suggested that he had detected an odor of controlled substances,

but not the strongest source of that odor.  Lt. Walker then directed Zeke to sniff at a medium

height around Mr. Beltran's car.  When they arrived back at the rear of the car again, Zeke began

sniffing the trunk seam methodically.  According to Lt. Walker, Zeke then began to sit down—a

response that Lt. Walker interpreted as an "indication."  Indicating is a behavior that

demonstrates Zeke has located the strongest source of the odor.

### 2. Car Search

Lt. Walker then informed Trooper Goheen that Zeke had indicated drugs were in the

trunk of Mr. Beltran's car.  While Lt. Walker stood at the front of Mr. Beltran's car with Mr.

Beltran, Trooper Goheen began searching the trunk.  Shortly after initiating his search, Lt.

Walker called Trooper Goheen to assist him.  Lt. Walker explained his request, testifying that

Mr. Beltran had become uncooperative.  Lt. Walker testified Mr. Beltran was acting as though he

wasn't paying full attention to Lt. Walker's directions.  Specifically, Lt. Walker said that he saw

behavior indicating that Mr. Beltran was thinking about whether to fight or flee from the scene.

At this point, Lt. Walker requested Trooper Goheen's help.  Together, they handcuffed Mr.

Beltran, and Lt. Walker escorted him to the hood of Trooper Goheen's patrol car.  Lt. Walker

testified that Mr. Beltran still was not compliant.  While Mr. Beltran did not resist Lt. Walker's

instructions overtly, he continued to pull away from Lt. Walker.

Trooper Goheen then resumed his search of the car's trunk.  He quickly found a package

of something he believed was methamphetamine.  It was located inside a duffel bag in the trunk.

Trooper Goheen searched the duffel bag while Lt. Walker secured Mr. Beltran in the passenger

seat of Trooper Goheen's patrol vehicle.

### D. Fourth Encounter

Trooper Goheen then walked to where Mr. Beltran was seated and began talking to him. He told Mr. Beltran to relax and not to make things worse. Gov. Ex. 1 at 19:29–55. Trooper Goheen told Mr. Beltran that they could "work through it together." *Id.* Mr. Beltran responded by asking how, and Trooper Goheen responded, "We'll discuss that." *Id.* at 19:59–20:09.

Next, Trooper Goheen closed the door of the car where Mr. Beltran was sitting, but the door did not latch. Trooper Goheen then began talking with Lt. Walker outside the patrol car. They discussed how to get Mr. Beltran's car back to the KHP office. Within ten seconds of Trooper Goheen closing the door, Mr. Beltran nudged it open with his leg and said, "Yo, come here." Mr. Beltran then said, "I'll tell you where everything's at." Trooper Goheen responded, "What's that?" Mr. Beltran repeated, "I'll tell you where everything's at." *Id.* at 20:26–33.

Trooper Goheen responded, "Okay, all right, I appreciate that." Trooper Goheen then made the following statement to Mr. Beltran: "Let me tell you something, I don't know if he explained something to you. You can . . . you can do one of two things, okay, you can . . . you can calm down, and we can talk about this, and you can help yourself out, okay, and I can help you." Mr. Beltran responded by asking Trooper Goheen, "How are you going to help me?" Trooper Goheen responded, "On these charges." Trooper Goheen then asked Mr. Beltran if there was any "more" in the car. Mr. Beltran nodded his head affirmatively and said, "On the left side." Then, Mr. Beltran yelled "left side" multiple times. *Id.* at 20:24–21:40.

Trooper Goheen testified that the officers found several more packages of methamphetamine under the carpet of the trunk on the left side. He explained that the packages were easy to find because they were in a place where officers commonly search.

Trooper Goheen and Lt. Walker then discussed the logistics of transporting Mr. Beltran and his vehicle to the KHP office. Trooper Goheen decided to use his patrol car to transport Mr. Beltran to the KHP's office in Russell, Kansas.

### E.        Fifth Encounter

During this transit, Trooper Goheen testified that he informed Mr. Beltran of his *Miranda* rights. He also testified that Mr. Beltran confirmed that he understood his rights. At some point during the trip, Mr. Beltran told Trooper Goheen that he had dropped a methamphetamine pipe on the floor of the patrol vehicle. Mr. Beltran also told Trooper Goheen that he had methamphetamine in his sock. Trooper Goheen later recovered about eight grams of methamphetamine from Mr. Beltran's sock.

The government says law enforcement officers recovered 11 packages from the duffel bag found in the trunk of Mr. Beltran's car. They found seven more packages inside the trunk lining on the driver's side of the vehicle. All packages were wrapped in black duct tape, and some had "M-36" labeled on them. A field test was done on one of the packages, and it tested positive for methamphetamine. The gross weight of the packages was estimated at 23 pounds.

## II.        Request to Suppress Evidence

Mr. Beltran now asks the court to suppress all evidence acquired during the search of his car. He also moves to suppress the statements he made to Trooper Goheen.

### A.        Fourth Amendment Standard

The Fourth Amendment[3] to our Constitution forbids unreasonable searches and seizures. *California v. Carney*, 471 U.S. 386, 390 (1985). When a defendant challenges the

---

[3]    "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

reasonableness of a search or seizure, the government bears the burden to prove the

reasonableness of that search or seizure by the preponderance of the evidence. *United States v.*

*Matlock*, 415 U.S. 164, 177 (1974); *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th

Cir. 2001). If the court determines that a search or seizure violated the Constitution, the

exclusionary rule prohibits admission into evidence the fruits of all evidence seized illegally.

*See Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963).

**B.     Analysis**

Mr. Beltran argues that: (a) Trooper Goheen did not have the requisite probable cause to

detain him—as he did during the third encounter—because the third encounter was not

consensual; (b) the dog sniff did not provide probable cause to search his car; and (c) the court

should suppress his statements to Trooper Goheen and evidence that officers found as a result

because the questioning violated his Fifth Amendment rights. Doc. 19 at 4. The court also

addresses other relevant issues—albeit briefly, since Mr. Beltran's motion did not raise those

issues.

Ultimately, the court concludes that the third encounter was a consensual encounter.

During this consensual encounter, Trooper Goheen developed reasonable suspicion to detain Mr.

Beltran long enough for a dog sniff. The dog sniff provided the law enforcement officers with

probable cause to search Mr. Beltran's vehicle. In contrast, the court determines that it must

suppress some of Mr. Beltran's statements—*i.e.*, those he made during the fourth encounter.

Finally, the court concludes that it should not suppress the statements Mr. Beltran made after

Trooper Goheen advised him of his *Miranda* rights. The court thus declines to suppress the

evidence acquired based on those statements.

### 1. Traffic Stop

Mr. Beltran does not challenge the validity of the initial traffic stop, and the court only addresses it briefly. "[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth Amendment]." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). A traffic stop can pass Fourth Amendment muster "if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995). Reasonable suspicion is "a particularized and objective basis for suspecting the person stopped of criminal activity." *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (internal quotation and citation omitted).

Trooper Goheen stopped Mr. Beltran for exceeding the posted speed limit. Kansas law makes it unlawful to speed in a construction zone. Kan. Stat. Ann. §§ 8-1558, 8-1559; *see also State v. Lichty*, No. 93,739, 2006 WL 538279, at *1–2 (Kan. Ct. App. Mar. 3, 2006). Trooper Goheen testified that Mr. Beltran was exceeding the speed limit in a construction zone, thus providing reasonable suspicion to make a traffic stop.

The challenges presented by Mr. Beltran's motion concentrate on what happened after the traffic stop had run its course. Namely, he challenges whether Trooper Goheen had reasonable suspicion to extend the traffic stop into the third encounter. This encounter begins with Trooper Goheen's request to ask Mr. Beltran some more questions and lasts until Trooper Goheen directed Mr. Beltran to get out of his car.

### 2. Nature of the Third Encounter

First, Mr. Beltran argues that the court should suppress evidence acquired from the search of his vehicle because Trooper Goheen unlawfully prolonged the traffic stop after he returned

Mr. Beltran's license and insurance documents to him. The court disagrees. As the following analysis explains, this encounter was a consensual one.

"Once an officer returns the driver's license and registration, the traffic stop has ended and questioning must cease; at that point, the driver must be free to leave." *United States v. Villa*, 589 F.3d 1334, 1339 (10th Cir. 2009). But "[a]dditional questioning unrelated to the traffic stop is permissible if the detention becomes a consensual encounter. Whether the driver has consented to additional questions and detention turns on whether a reasonable person would believe he was free to leave or disregard the officer's request for information." *Id.* at 1339–40 (internal quotations and citations omitted). So, the court must determine if the encounter between Trooper Goheen and Mr. Beltran became a consensual one or, alternatively, if Trooper Goheen had reasonable suspicion to prolong the detention. *See United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998) ("Lengthening the detention for further questioning beyond that related to the initial stop is permissible in two circumstances. First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring. Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter." (citations omitted)). The facts here established that the third encounter between Trooper Goheen and Mr. Beltran was a consensual encounter.

"A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer." *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000). "Whether an encounter can be deemed consensual depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter." *Id.*

Mr. Beltran contends that his interactions with Trooper Goheen after he returned Mr. Beltran's documents were not consensual for two alternative reasons: (1) Mr. Beltran could not safely leave; and (2) Trooper Goheen did not give him time to agree to additional questioning. The court evaluates Mr. Beltran's arguments by considering the totality of circumstances known to Trooper Goheen. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49 (1973) ("Voluntariness is a question of fact to be determined from all the circumstances."); *see also Florida v. Bostick*, 501 U.S. 429, 439 (1991) ("We adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."); *United States v. Hill*, 199 F.3d 1143, 1148 (10th Cir. 1999) (noting that "no single factor is determinative" and concluding that the court must consider "the totality of the circumstances surrounding [an] encounter" to determine whether it was consensual).

In traffic stop cases, the Tenth Circuit has identified factors tending to suggest an encounter was not consensual and, conversely, factors tending to suggest an encounter was consensual. The factors suggesting an absence of consent are: "the threatening presence of several officers, the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory, the prolonged retention of a person's personal effects such as identification, the absence of other members of the public, and the officer's failure to advise the defendant that [he] is free to leave." *United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (quoting *Hill*, 199 F.3d at 1147–48 (internal quotation marks and other citation omitted)). The factors suggesting that consent was given are: "an officer's 'pleasant' manner and a tone of voice that is not 'insisting,' a public location such as the shoulder of an interstate highway, in

public view, and the prompt return of the defendant's identification and papers." *Id.* (internal quotation marks and citations omitted). On balance, the factors favor the conclusion that the third encounter was a consensual one. Because several of these factors overlap with one another, the court discusses them together.

First, the evidence establishes that only Trooper Goheen was present at Mr. Beltran's window during the additional questioning. But though Trooper Goheen's presence beside Mr. Beltran's car was not necessarily threatening, it may have restricted Mr. Beltran's ability to drive away. *See* Doc. 19 at 7–8 (Mr. Beltran argued that he was "unable to rejoin traffic with reasonable safety because he could not see if there were other cars on the highway," as Trooper Goheen was "standing so near to his vehicle." (internal quotations omitted)). While the court recognizes the possibility of a visual obstruction, it also realizes that driving away was not Mr. Beltran's only option for ending the encounter. He simply could have declined to answer any more questions or rolled up his window. Balanced against one another, the facts germane to this factor slightly favor a finding that the third encounter was consensual.

Next, Trooper Goheen's manner and tone of voice favor a consensual encounter. Trooper Goheen was cordial throughout the interaction comprising this third encounter. And, importantly, Mr. Beltran responded affirmatively when Trooper Goheen asked him if he could ask more questions. This factor also favors a consensual encounter.

The third factor—retention of Mr. Beltran's documents—favors a finding of consent. Trooper Goheen returned Mr. Beltran's license and insurance documents to him promptly.

The fourth factor—the location of the encounter—also favors a conclusion of consent. This is so because, as explained by *Ledesma*'s description of this factor, Trooper Goheen and Mr. Beltran were on the shoulder of an interstate highway, in public view. 447 F.3d at 1314

15

(determining that an encounter in "a public location such as 'the shoulder of an interstate highway, in public view,'" favors a conclusion of consent (quoting *United States v. Soto*, 988 F.2d 1548, 1558 (10th Cir. 1993))).

Finally, Trooper Goheen ended the initial stop by telling Mr. Beltran to "have a safe trip." Gov. Ex. 1 at 12:00–04. This phrase suggested Mr. Beltran was free to leave. *See Ledesma*, 447 F.3d at 1315 ("Phrases like 'thank you' and 'have a safe one' signal the end of an encounter, and afford a defendant an opportunity to depart. Although [the trooper] did not explicitly inform [the driver] and her passenger that they were free to leave, [the trooper's] words of farewell suggested that any subsequent discussion was consensual."). This factor also favors a consensual encounter.

In sum, considering all the evidence, all of the *Ledesma* factors favor a finding that the third encounter between Trooper Goheen and Mr. Beltran was a consensual encounter. Naturally, the evidence favoring a conclusion of consent is stronger for some factors than it is for others. But no factor favors a finding that Mr. Beltran felt compelled to allow the encounter to continue. Based on the factors the Circuit outlined in *Ledesma*, the court concludes that the third encounter was a consensual one.

### 3. Reasonable Suspicion for Dog Sniff

Impliedly, at least, Mr. Beltran's motion challenges whether Trooper Goheen had developed reasonable suspicion to detain Mr. Beltran for a dog sniff. "[A] dog sniff is not fairly characterized as part of the officer's traffic mission"—rather, it is "aimed at detecting evidence of ordinary wrongdoing." *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (internal quotation marks, corrections, and citations omitted). Consequently, an officer must have

reasonable suspicion of criminal wrongdoing to detain the defendant while the drug detection canine is employed. *See id.*

The facts Trooper Goheen knew when he asked Mr. Beltran to get out of his car for the dog sniff established reasonable suspicion of criminal wrongdoing. *See United States v. Garcia*, 167 F. App'x 737, 740–41 (10th Cir. 2006) (finding that the driver's nervousness, inconsistent stories that driver and passengers gave, and "the quick turnaround trip" from California to Illinois provided reasonable suspicion to detain vehicle for a dog sniff). Specifically, when he detained Mr. Beltran for a dog sniff, Trooper Goheen had confirmed that Mr. Beltran never had visited Kansas before. Trooper Goheen also had received inconsistent information from Mr. Beltran. Mr. Beltran told the Trooper that no one else had brought Mr. Beltran's car to Kansas before the day of the stop. But the LPR showed that Mr. Beltran's car was in Kansas just three months earlier, on June 28, 2017. These inconsistencies gave Trooper Goheen reasonable grounds to believe that Mr. Beltran was lying to him about the reason for his travel through Kansas. And our Circuit has held that lying is an indicator of criminal activity. *See, e.g.*, *United States v. McRae*, 81 F.3d 1528, 1536 (10th Cir. 1996) (concluding defendant's "untruthful answer to [a] question [about whether he had a criminal history of drug arrests] provided further articulable suspicion to ask if [defendant] was carrying contraband and inquire about a search of the car"); *United States v. Carhee*, 27 F.3d 1493, 1498 (10th Cir. 1994) (finding as a factor of reasonable suspicion that defendant had "lied about his departure city, telling the officers he came from Memphis when the officers knew he had come from Los Angeles, a source city for narcotics"); *United States v. Moore*, 22 F.3d 241, 243 (10th Cir. 1994) (agreeing with the district court's finding of reasonable suspicion where defendant "had lied about where he had boarded the train and the officers knew that he had lied").

Also, Trooper Goheen learned during this third encounter with Mr. Beltran that he planned to remain in Kansas City until "Saturday night." Gov. Ex. 1 at 12:26–34. This plan struck the trooper as unusual. He had initiated the traffic stop at 8:20 a.m. on September 15, 2017—a Friday. At that point, Mr. Beltran was still about three hours away from arriving in Kansas City. Together, these facts suggested to Trooper Goheen that Mr. Beltran was driving from California to Kansas City for a stay lasting about 30 hours. This fact-based inference reasonably aroused Trooper Goheen's suspicions—an inference that our Circuit has approved before. *See Garcia*, 167 F. App'x at 741 (referencing a "quick turnaround trip" from California to Illinois as one of three facts providing reasonable suspicion to detain a defendant for a dog sniff).

Finally, Trooper Goheen testified he saw Mr. Beltran show signs of abnormal nervousness. This nervousness included physical manifestations—shaky hands, a sweaty forehead, and downcast eyes. Trooper Goheen also testified that Mr. Beltran's extreme nervousness did not dissipate when he told Mr. Beltran that he only was issuing a warning. Combined, these factors provided Trooper Goheen with more fact-based reasonable suspicion to believe Mr. Beltran was engaged in criminal wrongdoing.

Trying to support reasonable suspicion, the government also relies on Mr. Beltran's inability to provide the address for his destination. But the court is not persuaded by this argument and declines to include it in the assessment because the government has not established that Mr. Beltran did not know the address. Trooper Goheen's questioning of Mr. Beltran proceeded this way: First, Trooper Goheen asked—generally—where Mr. Beltran was going. Mr. Beltran responded, "Kansas City." Then, Trooper Goheen asked a slightly more specific question: "What part?" And Mr. Beltran responded that he was going to "the northern part" of

the city. But no evidence established that Trooper Goheen ever asked Mr. Beltran, "Do you know the address of where you're going?" or some similar question. Instead, Trooper Goheen's questions were general enough that they provide no basis for an argument that Mr. Beltran didn't know his destination's address.

Also, Trooper Goheen testified that he believed it was suspicious that Mr. Beltran described his destination as "the northern part" of Kansas City. He said that, in his experience, people typically would respond with the name of a suburb, "Overland Park," for instance. While people who are familiar with the Kansas City area might give a response like this one, a person driving from California reasonably might not know the specific suburb of his destination. Moreover, the City of Kansas City, Missouri, consists of two parts: one portion located south of the Missouri River and a second part located north of that river. So, the court is unpersuaded that Mr. Beltran's reference to "the northern part" of Kansas City contributed anything to Trooper Goheen's suspicions of criminal wrongdoing.

In sum, the court concludes that the inconsistencies in Mr. Beltran's statements about his car's presence in Kansas, his quick turnaround driving trip between California and Kansas, and his extreme nervousness—taken together—provided Trooper Goheen with reasonable suspicion to detain Mr. Beltran for a dog sniff of his car.

### 4.     Probable Cause for Car Search

In general, law enforcement officers must secure a warrant to search a person or his house, papers, or effects. U.S. Const. amend. IV. But there are exceptions to this rule, and the well-developed "vehicle exception" is one of them. Under this exception, law enforcement officers may search an automobile during a traffic stop without a warrant "if probable cause exists to believe that contraband or evidence of criminal activity is located inside." *United States*

*v. Baylor*, No. 06-40099-01-RDR, 2006 WL 3146348, at *2 (D. Kan. Oct. 31, 2006) (first citing *Chambers v. Maroney*, 399 U.S. 42 (1970); then citing *Carroll v. United States*, 267 U.S. 132 (1925)).  Mr. Beltran's next argument contends that Trooper Goheen lacked the requisites to invoke this exception.

A drug detection canine can provide the requisite probable cause when it "alerts," or exhibits "a distinctive set of behaviors[] that [it] smelled drugs" in the car.  *See Florida v. Harris*, 568 U.S. 237, 240, 246–47 (2013).  Here, to establish probable cause for searching Mr. Beltran's vehicle, the government relies on such an alert.  It contends that Zeke—a trained canine deployed by Lt. Walker—alerted after sniffing Mr. Beltran's car and thus provided probable cause for searching it.

Mr. Beltran's motion challenges the proposition that Trooper Goheen had probable cause to search Mr. Beltran's car.  Mr. Beltran makes two distinct arguments to support his challenge. First, he argues that the standards for Zeke's certification process used faulty methods or standards that were too lax.  So, the argument goes, Zeke's alert didn't provide probable cause. Second, he contends that Zeke never indicated, or exhibited behavior showing he had found the strongest source of the odor.  The court addresses these arguments separately, below.

### a.  Zeke's Alert

Mr. Beltran argues that Zeke's behavior "indicating" the presence of methamphetamine was not obvious.  Doc. 19 at 16–17.  He places the burden on the government to identify this behavior.  Mr. Beltran's argument describes a typical dog sniff this way:

> A well-trained drug-detection dog begins a search in "scanning" mode—sniffing for the odor of contraband.  If it smells contraband, the dog gives an "alert."  An alert is sometimes, but not always, a natural behavior for the dog that an average person might not recognize as significant.  Once the dog has given an alert, it transitions from "scanning" to "pinpointing:"  trying to find where the odor is strongest.  Once the dog has discovered it, the dog gives an "indication."  An

indication is behavior that an average person would recognize as significant. Drug-detection dogs give either active or passive indications. An active indication involves the dog barking or scratching at the odor's source. A dog trained to passively indicate will either sit down, lie down, or freeze in place, depending on what it has been trained to do.

Doc. 19 at 16–17.

Lt. Walker testified that Zeke indicates passively: he sits and intensely stares at a particular area. Lt. Walker also explained that when he alerts, Zeke is quite calm and methodical, has an intense focus, pushes his ears slightly back, and almost always intensifies his sniffing. After Zeke alerts, he then tries to indicate—that is, determine the strongest source of the smell. When sniffing Mr. Beltran's car, Zeke focused on the seam of the vehicle's trunk. Lt. Walker explained that, during his sniff of the trunk area of Mr. Beltran's car, Zeke laid his ears back, he was focused, and he did not follow Lt. Walker as he moved from the trunk area to the passenger's side of the vehicle. Instead, Lt. Walker testified, Zeke remained focused on the trunk and began to sit.[4]

Mr. Beltran asserts that the government has not adduced sufficient evidence that Zeke indicated at Mr. Beltran's car—that is, he located the strongest source of any odor that he identified. Mr. Beltran also argues that the Tenth Circuit's controlling case is *United States v. Muñoz-Nava*. *See* Doc. 37 at 2 (citing 524 F.3d 1137 (10th Cir. 2008)). In response, the government cites *United States v. Parada*. *See* Doc. 40 at 2 (citing 577 F.3d 1275 (10th Cir. 2009)). *Parada* explained at considerable length the difference between alerts and indications, and held that "probable cause [can be] satisfied by [a narcotics detection dog's] alert to the odor of an illegal substance in the vehicle." 577 F.3d at 1282. The Circuit held that "it was not necessary for the dog to indicate the exact source of that odor," *id.*, to establish probable cause.

---

[4]    Gov. Ex. 1 at 15:20–50.

In *Muñoz-Nava*, the Circuit determined that, on the facts of that case, "absent a full alert, the dog's behavior was not sufficient to support probable cause." *Muñoz-Nava*, 524 F.3d at 1145. In that case, the Circuit distinguished between the dog's behavior when it was beginning to alert, which included "turning its head back, backtracking, and breathing more deeply," from the dog's behavior during an "actual alert," which the Circuit defined as the moment "when the dog has detected the source of the odor." *Id.* at 1140 n.1 (noting that "[d]uring an alert, [a] dog bites, paws, or scratches the source of the odor"). The Circuit determined that the dog in *Muñoz-Nava* smelled the odor of narcotics, but could not "pinpoint" the source of the odor. *Id.* Nonetheless, the Circuit concluded that while the dog's "behavior change alone would not constitute probable cause," courts can consider that change "when determining whether all of the relevant evidence establishes probable cause." *Id.* at 1145–46.

The court understands the Circuit's holdings to establish that a dog's alert—when evaluated as part of the totality of the circumstances—is sufficient to support probable cause. The court also is not persuaded that *Muñoz-Nava* governs the facts of this case. The evidence here goes one step beyond the facts in *Muñoz-Nava*, where the dog "could not locate the source of the odor." *Id.* at 1140. The facts of this case more closely align—though not perfectly—with the Circuit's discussion in *Parada*, where the dog "discovered an odor he was trained to detect" but did not "indicate or pinpoint the source of the odor." *Parada*, 577 F.3d at 1279 (A law enforcement officer testified in *Parada* that, during a traffic stop, the narcotics detection dog's "body stiffened and his breathing became deeper and more rapid, signaling that he had discovered an odor he was trained to detect." The dog "tried to jump in the [car] window, but [the officer] pulled him off before he succeeded." The dog "did not indicate or pinpoint the

source of the odor, which [the officer] believed was due to his not allowing the dog inside the vehicle.").

Here, both Lt. Walker's testimony and Government Exhibit 1 demonstrate that Zeke alerted to the presence of a controlled substance in the trunk of Mr. Beltran's car. Lt. Walker testified that Zeke alerted at the back of the car and signaled that alert by laying his ears back, sniffing along the trunk seam of Mr. Beltran's car, and staying focused on the trunk seam instead of following Lt. Walker to the car's passenger side. Lt. Walker also testified that Zeke began to sit, a behavior he is trained to display when he indicates. While Zeke's move to sit is not readily apparent from the dashcam video captured in Government Exhibit 1, that does not decide the question. Even if Zeke did not fully indicate, *i.e.*, find the drugs' exact location, because he only began to sit, both *Parada* and *Muñoz-Nava* recognize that Zeke's alert to Mr. Beltran's car trunk was sufficient to support probable cause.

The court thus finds that Zeke alerted to the presence of a controlled substance in Mr. Beltran's car trunk. Based on this finding, the court concludes that alert was sufficient to provide probable cause to search Mr. Beltran's car without a warrant. The court next addresses Mr. Beltran's argument that Zeke's certification process used faulty methods or standards that were too lax.

### b. Zeke's Certification

Mr. Beltran asserts in his motion that the records the government produced fail to establish that Zeke was properly certified. Doc. 19 at 15–16. He explains that the KHP's certification of both Lt. Walker and Zeke was measured by "low or faulty" standards. *Id.* And, Mr. Beltran reasons, Zeke's training records from the date of his certification—October 3, 2016—do not demonstrate that Zeke passed the testing procedure in a manner sufficient to merit

a certification. He argues the records do not show any testing, procedures, certification standards, or programs that Zeke passed to become certified. And, Mr. Beltran asserts, the court should give more weight to controlled testing than field performance.

During the motion hearing on August 2, 2018, Mr. Beltran argued that the KHP does not apply uniform standards capable of certifying handlers and narcotics detection canines. Mr. Beltran directed the court to Florida International University's Scientific Working Group on Dog and Orthogonal Detector Guidelines ("SWGDOG") as a model for "best practices" for training and certification. Def.'s Exs. 13, 14, 18. The government objected to those exhibits, arguing that they are not relevant and that they constitute expert testimony without a proper foundation. The documents Mr. Beltran seeks to admit as Defendant's Exhibits 13, 14, and 18 squarely fall within the definition of hearsay under the Federal Rules of Evidence. *See* Fed. R. Evid. 801(c)(1)–(2). They incorporate out-of-court statements that Mr. Beltran offered to prove the truth of the content asserted in those exhibits. *See id.* But the Tenth Circuit has "held that the rules of evidence do not apply at suppression hearings." *United States v. Solis*, 156 F.3d 1244, 1998 WL 487020, at *4 (10th Cir. Aug. 10, 1998) (citing *United States v. Merritt*, 695 F.2d 1263, 1270 (10th Cir. 1982)). The court, in its discretion, elects to accept Defendant's Exhibits 13, 14, and 18 as part of the evidentiary record for Mr. Beltran's motion. The court finds that they have a sufficient indicia of reliability to warrant the court's consideration. *See United States v. Yarbrough*, 527 F.3d 1092, 1099 n.3 (10th Cir. 2008) (citing *United States v. Miramonted*, 365 F.3d 902, 904 (10th Cir. 2004)) ("[H]earsay testimony is admissible at a suppression hearing as long as it bears sufficient indicia of reliability."). Even taking those exhibits into account,

however, the court is not persuaded that the KHP's certification and training standards are faulty.[5]

In addition to the SWGDOG standards, Mr. Beltran introduced the Utah Peace Officer Standards and Training ("Utah POST"), standards which the KHP bases its training and certification programs. Def.'s Exs. 12, 15. Specifically, Mr. Beltran argued that the KHP's certification program does not include enough testing scenarios involving "diversions," *i.e.*, distracting odors. Mr. Beltran asserted that the KHP did not provide any evidence demonstrating whether Zeke falsely indicated during his certification testing. He also argued that the KHP's certification program is unclear about the consequences of a dog falsely indicating to a non-contraband odor—a diversion. Such diversions, he contends, are necessary for the certifying agency to assess whether the dog actually can identify controlled substance odors. Mr. Beltran also asserted that third-party officers who certified the KHP's canines and officers had too much discretion to control the certification process. In sum, Mr. Beltran argues that the KHP's training and certification guidelines—when compared to the standards used by SWGDOG or Utah POST—are faulty.

The court evaluates the KHP's training and certification procedures under the standard recognized by the United States Supreme Court in *Florida v. Harris*. 568 U.S. 237 (2013). There, the Court recognized that a defendant "may contest the adequacy of a certification or training program" by "asserting that its standards [were] too lax or its methods faulty." *Id.* at 247. The defendant bears the burden of demonstrating that a dog is unqualified. *United States v. Parada*, 577 F.3d 1275, 1283 (10th Cir. 2009).

---

[5] The court recognizes that Mr. Beltran's offer of his Exhibit 18 was a limited one. *See* Tr. of Oral Arg., 4–8, July 17, 2018. The court's admission of Defendant's Exhibit 18 is limited to that purpose.

Before *Harris*, the Tenth Circuit had expressed doubt about "compelling the use of statistics to scrutinize the performance of individual dogs in every case" because that approach would define probable cause "by reference to some one-size-fits-all mathematical equation." *United States v. Ludwig*, 641 F.3d 1243, 1251 (10th Cir. 2011). The Circuit had characterized the court's inquiry about the reliability of narcotics detection dogs as one "'assessing the reliability of the credentialing organization, not individual dogs.'" *United States v. Kitchell*, 653 F.3d 1206, 1224 (10th Cir. 2011) (quoting *Ludwig*, 641 F.3d at 1251). If the challenging party demonstrates that the "credentialing organization is 'a sham,' then 'its certification . . . no longer serve[s] as proof of reliability.'" *Id.* (quoting *Ludwig*, 641 F.3d at 1251).

Responding to one defendant's challenge to a narcotics detection dog's certification, the Tenth Circuit concluded that reliability could properly be established with copies of the dog and handler's "Canine Team Certification Test . . . showing that [the dog] was tested on and passed certification tests" for relevant drugs. *Id.* at 1225. The defendant in that case "point[ed] to no evidence" that the certifying organization in question was "unfit to make [a] determination" about the narcotics detection dog's certification. *Id.* In a different case, the Tenth Circuit concluded that a dog was adequately certified because he "ha[d] a certification and there [was] no evidence that he had a poor accuracy record or that his certification was ever revoked." *Parada*, 577 F.3d at 1283 (citing *United States v. Kennedy*, 131 F.3d 1371, 1376–77 (10th Cir. 1997)).

The court does not read *Harris* to adopt the exacting standard that defendant would have the court attach to it. *See* 568 U.S. at 244–47 (concluding that the government may establish a dog's reliability for detecting drugs in several ways). Certainly, *Harris* allows defendants to challenge a narcotics detection dog's reliability. But a "dog's satisfactory performance in a

certification or training program can itself provide sufficient reason to trust his alert." *Id.* at 246–47. Even if a dog is not formally certified, sufficient evidence exists to trust that dog's alert "if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs." *Id.* at 247; *Kitchell*, 653 F.3d 1225.

The court concludes that the evidence presented at the motion hearing in this case provided sufficient information about Zeke's certification and training. First, Lt. Walker testified that he was certified as a patrol canine handler in 2009 and as a trainer for new handlers in 2013. Lt. Walker also testified that Zeke was chosen as a patrol canine in March 2015, completed a ten-week training course, and was certified as a narcotics detection and patrol-certified dog upon completing the course sometime around May 2015. Lt. Walker explained that an external, third-party judge—in Zeke's case, Overland Park Police Department Officer Cory Flaming—certified that Zeke had complied with the KHP's internal standards for narcotics detection dogs. Lt. Walker outlined several scenarios that Officer Flaming used to test Zeke, including an automobile scenario. Lt. Walker testified that the KHP used a process to develop an overall score, ranging from a 1 (highest score) to a 6 (lowest), that combined Lt. Walker and Zeke's performance together. Lt. Walker explained that any score between a 4 and a 6 would constitute a failing score, and that he and Zeke received a passing score of 2.18. Lt. Walker also testified that he and Zeke had never failed a recertification test, and that he engages Zeke in weekly "maintenance" training to sustain Zeke's detection and patrol capabilities.

Officer Flaming testified that narcotics detection dogs are certified based on their demonstrated ability to recognize marijuana, cocaine, heroin, and methamphetamine. He explained that the certification process used by the KHP requires dogs to run through several scenarios in which they are expected to identify and locate the source of each drug's odor.

Officer Flaming also testified that one scenario specifically used a vehicle including a diversion. He also explained that a dog would receive a failing grade if it located and identified the diversion as a controlled substance.

The court is persuaded that Officer Flaming used and described a sufficiently detailed, consistent, and controlled system for certifying narcotics detection dogs and that the process complies with *Harris*'s standards. *See Harris*, 568 U.S. 246–47 ("If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs."). Also, the court is satisfied that the government has proved that Zeke and Lt. Walker successfully completed the evaluation and recertification process, assessing Zeke's ability to detect narcotics properly. In addition to Zeke's Narcotics Detector Dog Certification Final Analysis for Serviceability (Gov. Ex. 3), the government has provided 120 pages of reports about Zeke's performance in controlled environments. Gov. Ex. 2. The court is not persuaded that the KHP's training and certification methodology itself is unsound simply because it does not match precisely the training and certification regimen outlined in the Utah POST guidelines. Though the KHP's program is modeled after the Utah POST program—as Lt. Walker testified—no legal authority required the KHP to follow the Utah POST program's guidelines to a tee. The Tenth Circuit has concluded that if a "credentialing organization" is "unfit to make [a] determination" about a narcotics detection dog's reliability, a narcotics detection dog's behavior may be insufficiently reliable to establish probable cause. *Kitchell*, 653 F.3d at 1225. The court is not persuaded that

the KHP, as an organization, is unfit to make a determination about Zeke's drug detection capabilities.

The court finds that the KHP's training and certification program for narcotics detection and patrol canines is reliable under *Harris*'s standards. The court also concludes that Zeke's certification through this program establishes the reliability of his alert in this case.

### 5. Request to Suppress Statements

Mr. Beltran's motion also asks the court to suppress statements he made both before and after Trooper Goheen advised him of his *Miranda* rights. He contends that the court should suppress his statements and evidence derived from them.

First, Mr. Beltran relies on the Self-Incrimination Clause of the Fifth Amendment. The Fifth Amendment to the United States Constitution protects individuals from compelled self-incrimination. U.S. Const. amend. V. To ensure that people understand this guarantee, the Supreme Court long ago established procedural safeguards that police must satisfy before questioning. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). These safeguards take the form of *Miranda* warnings—a proactive expression of rights that police must deliver. But a law enforcement officer need not recite this refrain before he asks anyone anything. Instead, an officer must recite the warnings before beginning a custodial interrogation. *Id.* Thus, to determine whether an officer must have given *Miranda* warnings, courts consider two factors: (1) whether the person questioned was in custody; and (2) whether a law enforcement officer interrogated him. *Id.* at 444–45.

A person is in custody for *Miranda* purposes "when he has been arrested or his freedom is curtailed to a degree associated with a formal arrest." *United States v. Cronin*, 540 F. Supp. 2d 1189, 1191 (D. Kan. 2008) (first citing *Stansbury v. California*, 511 U.S. 318, 322 (1994); then

citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).  In other words, a person is in custody when he is arrested or subjected to circumstances that are "the functional equivalent of [a] formal arrest."  *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).  Here, the government concedes that Mr. Beltran was in custody.  So, the *Miranda* issue raised by Mr. Beltran's motion turns on the interrogation prong of this test.

### a. Interrogation

In the *Miranda* context, the term "interrogation" includes both "express questioning," or "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  While the officer's intent is not irrelevant to the inquiry, courts consider whether a reasonable officer would foresee that his "words or actions" would elicit an incriminating response.  *Id.* at 300–02.  If so, the law treats the words or actions as the functional equivalent of a law enforcement officer expressly questioning a person about criminal liability.  *Id.*

Here, Mr. Beltran argues that Trooper Goheen expressly questioned him during the fourth encounter, *i.e.*, the period encompassing Trooper Goheen's conversation with Mr. Beltran while he was seated in the trooper's patrol vehicle and Mr. Beltran's statements about additional drugs in his car.  While the court finds the fourth encounter more nuanced than Mr. Beltran describes it, the court agrees with him generally:  Trooper Goheen's words amounted to interrogation.

At the July 17, 2018, hearing, Trooper Goheen testified that his statements to Mr. Beltran were designed to de-escalate the situation.  Mr. Beltran had become quite agitated, Trooper Goheen explained, so he was trying to calm him down.  The court's review of the dash camera footage initially supports this as the trooper's purpose.  Trooper Goheen told Mr. Beltran to

"relax" and not to make things "worse."  Gov. Ex. 1 at 19:29–55.  But then, Trooper Goheen

quickly said that the two of them could "work through [the situation] together."  And when Mr.

Beltran asked how, Trooper Goheen responded, "We'll discuss that."  *Id.* at 19:59–20:09.

Trooper Goheen's last two statements crossed the line drawn by *Innis*.  Trooper Goheen's

statements set the stage for him to discuss with Mr. Beltran how they were going to work

through the situation created by the contraband located in Mr. Beltran's car.  If Trooper Goheen

had stopped there, the court might view his statements simply as ones designed to calm Mr.

Beltran.  But then, Mr. Beltran nudged open the door of the patrol car where he was seated.  He

called out to Trooper Goheen, saying, "Yo, come here."  Mr. Beltran then said, "I'll tell you

where everything's at."  Trooper Goheen responded, "What's that?"  And Mr. Beltran repeated,

"I'll tell you where everything's at."  *Id.* at 20:26–33.

Trooper Goheen responded, "Okay, all right, I appreciate that."  Trooper Goheen also

said, "Let me tell you something, I don't know if he explained something to you.  You can . . .

you can do one of two things, okay, you can . . . you can calm down, we can talk about this, and

you can help yourself out, okay, and I can help you."  Mr. Beltran asked, "How are you going to

help me?"  And Trooper Goheen responded, "On these charges."  Trooper Goheen asked if there

was more in the car, and Mr. Beltran nodded his head affirmatively, adding, "On the left side."

Then, Mr. Beltran yelled "left side" multiple times to the troopers.  *Id.* at 20:24–21:40.

The government argues that Mr. Beltran's statement that he would tell Trooper Goheen

where everything was located was a voluntary statement that *Miranda* does not reach.  *See*

*Miranda v. Arizona*, 384 U.S. 436, 478 (1966) ("Volunteered statements of any kind are not

barred by the Fifth Amendment and their admissibility is not affected by [the] holding [in

*Miranda*].").  And the government also asserts that Trooper Goheen asked his follow-up

questions of Mr. Beltran merely to clarify what he had said already, and those clarifying questions weren't designed to elicit an incriminating response.

As support for its argument, the government directs the court to *United States v. Cash*. *See* Doc. 24 at 34–35 (citing 733 F.3d 1264, 1277 (10th Cir. 2013)). There, police had handcuffed the defendant and placed him in a patrol car after he became uncooperative. *Id.* at 1269–70. At some point, the defendant indicated he wanted to speak with the officer. *Id.* at 1270. Then:

> Officer Brittingham approached the open passenger side window of the cruiser and asked [the defendant] "what was going on[?]" According to Officer Brittingham, Mr. Cash responded, "[y]ou've got to help me. They're going to kill me." Officer Brittingham then asked, "[w]hat's the deal?" He testified that Mr. Cash replied, "I've been dealing drugs, I've been messing with some really bad people, they're going to kill me, you've got to help me, you've got to get me out of here." The police had not *Mirandized* the defendant before this conversation.

*Id.* at 1270 (citations to the record omitted).

The Circuit concluded that this exchange did not amount to an interrogation. *Id.* at 1278–79 (first citing *Andersen v. Thieret*, 903 F.2d 526, 532 (7th Cir. 1990) (concluding no interrogation had occurred where an unwarned defendant volunteered, "I stabbed her," police responded, "Who?" and defendant gave an incriminating name); then citing *United States v. Rhodes*, 779 F.2d 1019, 1032 (4th Cir. 1985) (determining no interrogation where unwarned drug dealer saw police officers confiscating his notebook and said, "You can't take that," to which a police officer responded, "Why?" The drug dealer stated, "I can't run my business without that."); and then citing 2 Wayne R. LaFave et al., *Criminal Procedure* §§ 6.7(d), 6.7(d) n.169 (4th ed. 2017) (noting that follow-up questions are not interrogation when they represent purely neutral efforts to clarify an earlier voluntary statement)).

*Cash* reasoned that

Although an incriminating response to "[w]hat's the deal?" was possible, the question was not so likely to produce an incriminating response that *Miranda* warnings were required. The interaction unfolded quickly and spontaneously at Mr. Cash's behest, and we cannot say that Officer Brittingham "should have known" that his follow up question would have elicited an incriminating response. *See* [*Innis*, 446 U.S.] at 302; *cf. United States v. Scalf*, 725 F.2d 1272, 1275–76 (10th Cir. 1984) ("on-the-scene" inquiry to find out what happened after alleged prison assault is not interrogation). Thus, *Miranda* does not prohibit the admission of Mr. Cash's second statement about dealing drugs.

*Id.* at 1279.

The court does not find *Cash* a suitable comparison to the exchange between Mr. Beltran and Trooper Goheen. In *Cash*, the officer asked a clarifying question: "What's the deal?" Here, after Trooper Goheen asked, "What?"—a clarifying question—he made two more statements amounting to words that he should have known were "reasonably likely to elicit an incriminating response." *See Innis*, 446 U.S. at 301. Trooper Goheen, in short, told Mr. Beltran that he could help Mr. Beltran mitigate the charges he faced. *Innis* makes statements like this one—statements seeking to elicit an incriminating response—impermissible without *Miranda* warnings.

The analysis might differ if Mr. Beltran had volunteered, "The drugs are in the left quarter panel," or volunteered to Trooper Goheen that there were more drugs in the car after Trooper Goheen said, "I appreciate that." But Trooper Goheen exceeded the permissible purpose of clarification allowed by *Cash* when he explained to Mr. Beltran that he could help him with the charges.

In sum, the series of Trooper Goheen's questions and statements leading Mr. Beltran to tell him that there were more drugs in the car constituted impermissible interrogation that occurred without *Miranda* warnings. Accordingly, the court suppresses all statements that Mr. Beltran made in this series of questions and statements. The court's suppression order reaches all statements beginning with Trooper Goheen's statement that the two of them could "work

through [the situation] together," and lasts until Trooper Goheen explicitly advised Mr. Beltran of his *Miranda* rights.

### b. Post-*Miranda* Warning Statements

Mr. Beltran also asks the court to suppress the statements he made after Trooper Goheen advised him of his *Miranda* rights—that is, during the fifth encounter.

The Supreme Court has provided five factors for courts to examine when deciding whether a tardy *Miranda* warning cures an underlying Fifth Amendment violation: (1) the comprehensive detail of the original questions and answers; (2) any overlap between the statements; (3) the proximity in time and space between the two statements; (4) whether the same officer conducted both interrogations; and (5) whether the officer treated the second interrogation as an extension of the first. *Missouri v. Seibert*, 542 U.S. 600, 615 (2004); *see also United States v. Carrizales-Toledo*, 454 F.3d 1142, 1150 (10th Cir. 2006) (discussing and applying *Seibert* factors).

On balance, these factors weigh against suppressing Mr. Beltran's post-*Miranda* statements. Mr. Beltran concedes that the first factor does not favor his request. The second factor weighs against him because there was little overlap between the statements. *See Carrizales-Toledo*, 454 F.3d at 1152 (noting that the defendant "provided significant new information" to a law enforcement officer "during [his] second questioning," differentiating this conversation from the encounter in *Seibert* where the law enforcement officer "covered the same ground in both rounds of questioning"). During the fourth encounter, Mr. Beltran explained where the drugs were located in his car. During the fifth encounter—after the *Miranda* warnings were given—he told Trooper Goheen about drugs and drug paraphernalia on his person. The court concludes these two interactions did not encompass the same information. Instead, Mr.

Beltran provided new information to Trooper Goheen after he informed Mr. Beltran of his *Miranda* rights, which weighs against a conclusion that there was any overlap between Mr. Beltran's statements during the fourth and fifth encounters.

The third and fourth *Seibert* factors favor suppression. Both encounters occurred in the patrol vehicle, and Mr. Beltran made all his statements to Trooper Goheen.

But the fifth *Seibert* factor weighs against suppression because Trooper Goheen established that Mr. Beltran volunteered that he had drugs and drug paraphernalia on his person, in contrast to his earlier statements about the location of the drugs in his car. *See id.* at 1152 (noting that the fifth *Seibert* factor is "perhaps the most important"); *see also Seibert*, 542 U.S. at 615–16 (noting that if "a reasonable person in the suspect's shoes could have seen the . . . questioning as a new and distinct experience, the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission").

On balance, *Seibert*'s five factors weigh against suppression. The analysis isn't entirely one-sided, as two of the factors favor suppression. But the other factors disfavor that conclusion, as does the evidence's totality.

Importantly, the record contains no evidence that any statements during the fifth encounter resulted from interrogation by Trooper Goheen. If Mr. Beltran volunteered them, they are not subject to suppression under *Miranda*. *See Miranda*, 384 U.S. 436, 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [the] holding [in *Miranda*]."). The court thus denies the portion of Mr. Beltran's motion that seeks to suppress his post-*Miranda* statements.

### c. Voluntariness

Mr. Beltran also invokes the Due Process Clause of the Fifth Amendment, arguing that his statements about more drugs being located in the car and on his person were involuntary. "When the government obtains incriminating statements through acts, threats, or promises which cause the defendant's will to be overborne, it violates the defendant's Fifth Amendment rights and the statements are inadmissible at trial as evidence of guilt." *United States v. Toles*, 297 F.3d 959, 965 (10th Cir. 2002). The court must determine the voluntariness of a statement based on the "totality of the circumstances"—meaning it must consider "'both the characteristics of the accused and the details of the interrogation'" where "'[n]o single factor is determinative.'" *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006) (first quoting *Toles*, 297 F.3d at 965; then quoting *United States v. Lugo*, 170 F.3d 996, 1004 (10th Cir. 1999)).

Here, Mr. Beltran focuses on the details of the interrogation—specifically, an alleged promise of leniency. "Where a promise of leniency has been made in exchange for a statement, an inculpatory statement would be the product of inducement, and thus not an act of free will." *Griffin v. Strong*, 983 F.2d 1540, 1544 (10th Cir. 1993) (internal citation omitted). A promise of leniency must be more than a "limited assurance"—an interrogation tactic that is permissible. *Lopez*, 437 F.3d at 1065 (citing *United States v. Lewis*, 24 F.3d 79, 82 (10th Cir. 1994)). For such a promise to rise to the level that it's impermissible, it must "critically impair a defendant's capacity for self-determination." *Id.*

In *Lopez*, the Circuit affirmed the district court's decision that a law enforcement officer impermissibly promised that the defendant would spend 54 fewer years in prison if he confessed to killing the victim accidentally. 437 F.3d at 1064. After telling the defendant that he would get six years instead of 60 if he said it was a "mistake," the officer gave the defendant examples

of other suspects who had received lenient sentences after confessing to killing someone by mistake. *Id.*

Here, Trooper Goheen did not explicitly promise Mr. Beltran less prison time if he provided a statement or that the government would not pursue criminal charges against him. Trooper Goheen did not even promise to inform prosecutors about Mr. Beltran's cooperation. An assurance this limited is permissible. *See Lewis*, 24 F.3d at 82 (holding that a law enforcement officer's promise to "make [the defendant's] cooperation known to the United States Attorney's Office" and statement to the defendant that the officer "himself could make no deals with" the defendant were permissible). In sum, if a promise of leniency was made, it did not critically impair Mr. Beltran's capacity for self-determination. The court thus declines to suppress Mr. Beltran's statements for that reason.

### d. Inevitable Discovery

Mr. Beltran's motion seeking to suppress his statements also includes evidence derived from those statements. The government argues that even if the court were to suppress Mr. Beltran's statements, it still should admit evidence of the drugs found in his car and on his person, in his sock. This argument relies on the inevitable discovery doctrine.

Under this doctrine, illegally acquired evidence may be admitted if it "ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). "The government bears the burden of proving by a preponderance of the evidence that the evidence would have been discovered without the Fourth Amendment violation." *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014). Typically, the Tenth Circuit has applied the doctrine to cases where an exception to the warrant requirement inevitably would have led to

the evidence's discovery. *United States v. Souza*, 223 F.3d 1197, 1203 (10th Cir. 2000) (collecting cases).

Here, the government argues that the troopers inevitably would have found the other methamphetamine in the car Mr. Beltran was driving because they already were searching it under the vehicle exception after the dog sniff provided probable cause. Trooper Goheen testified that he believes he would have found this additional methamphetamine. The troopers, he testified, planned to take the vehicle back to the KHP's office in Russell, Kansas. There, Trooper Goheen explained, officers conduct a more thorough search than the one typically conducted roadside. Also, Trooper Goheen testified that the additional packages were located under the carpet of the trunk next to the left quarter panel. He testified it was simple to locate the packages there because officers commonly search that location, and the carpet was not glued or otherwise fastened to the car's frame.

The government also contends that Trooper Goheen would have found the methamphetamine in Mr. Beltran's sock during a search incident to arrest. *See Chimel v. California*, 395 U.S. 752, 762–63 (1969) ("When an arrest is made, it is reasonable . . . for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction."). Trooper Goheen testified that although he frisked Mr. Beltran before detaining him, he would have conducted a full body search of Mr. Beltran at the KHP office. Trooper Goheen specifically noted that the search would have included Mr. Beltran's socks.

The government has established by a preponderance of the evidence that commonly applied practices would have led the KHP to discover the additional contraband located near the left quarter panel of Mr. Beltran's car and that located in his sock. The court concludes that

troopers inevitably would have discovered the additional packages in Mr. Beltran's trunk and the bag in Mr. Beltran's sock.  The court thus declines to suppress this evidence.

## III.     Conclusion

For reasons explained, the court grants Mr. Beltran's Motion to Suppress in part and denies it in part.  The court concludes that Mr. Beltran's third encounter with Trooper Goheen was consensual and that Trooper Goheen had reasonable suspicion to detain Mr. Beltran's car for a dog sniff.  Also, the court determines that the KHP's training and certification procedures for narcotics detection dogs is reliable, and that Zeke's alert when sniffing the car Mr. Beltran was driving sufficiently supported probable cause to search the car.  The court further concludes that it must suppress the statements Mr. Beltran made during the fourth encounter before he received *Miranda* warnings, and after Trooper Goheen's impermissible line of questioning.  Finally, the court declines to suppress statements Mr. Beltran made after he received the *Miranda* warnings, as well as the evidence derived from those statements.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Juan Beltran's Motion to Suppress (Doc. 18) is granted in part and denied in part.

**IT IS SO ORDERED.**

**Dated this 1st day of November, 2018, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**